For the reasons assigned, the judgment appealed from is affirmed.

---

(34 South. 585.)

No. 14,667.

FORD v. EAST LOUISIANA R. CO.*

(April 27, 1903.)

### CARRIERS—EXPULSION OF PASSENGER—"SCALPING" ON TRAIN.

1. Because a traveler on a railway train has no ticket, that, in itself, furnishes no warrant for putting him off the train. Though he have no ticket the right is his to pay the fare in cash. The demand upon him must be either for a ticket, or for payment of the fare in cash, and if he offer to pay, the railway company ejects him at its peril.

2. If a person, who is in the employ of a connecting railway company, and because of such employment is permitted to ride free on the trains of the other company, is warned not to traffic in the excursion tickets of the company, and disregarding this warning is detected in "scalping" tickets *while on the train*, it might possibly furnish justification to the conductor in stopping the train and putting him off, even though he offered to pay the fare.

3. But, certainly, a person who "scalps" railway tickets other than on the train cannot be denied transportation over the lines of the railroads in whose tickets he traffics. He is a part of the general public and railway companies, as common carriers, must, ordinarily, permit all who pay the regular fare to travel on their trains.

(Syllabus by the Court.)

Appeal from Twenty-Sixth Judicial District Court, Parish of St. Tammany; James M. Thompson, Judge.

---

*Rehearing denied June 9, 1903.

Action by Alfred W. Ford against the East Louisiana Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Benjamin Moore Miller, for appellant. Duncan S. Kemp and Thomas Marshall Miller, for appellee.

BLANCHARD, J. The plaintiff, a colored man, was employed as porter on excursion trains which ran twice a week over the New Orleans and Northeastern railroad from the City of New Orleans to Pearl River.

Sometimes, too, he did service as porter on passenger trains other than excursion trains. His employment, however, was not such as to occupy him each day.

At Pearl River the line of defendant company connects with the New Orleans and Northeastern railroad, and extends thence to Covington, a town some twenty-five miles to the northwest of Pearl River.

Plaintiff made his home at Covington, his family consisting of himself, wife and daughter.

The excursion trains of the N. O. & N. E. R. R. were run in connection with defendant's railroad—Covington being the farthest point of the excursions. Excursion tickets were sold with coupons for each road.

Plaintiff had been in the employ of the N. O. & N. E. R. R. for seven or eight years, and because of the connection of that road with defendant company's road, he had been permitted to ride free, as a railway employé, over defendant's road, in passing to and fro between Pearl River and Covington, going to and returning from his work on the first named railroad.

It appears that he and others had been in the habit of trafficking in the return end of excursion tickets used over defendant's road. That is to say, doing on a small scale a kind of "scalper's" business—buying and selling tickets that had been partially used. This was forbidden by the rules of defendant company—the excursion tickets being stamped "not transferable."

A new manager having taken charge of defendant's road, plaintiff was questioned by him relative to his riding free over the road and his practice of buying and selling the unused portions of excursion tickets. Plaintiff admitted he had been doing this, but on being cautioned against it by the manager and warned that it was against the rules, he promised to discontinue the practice. He was permitted to continue to ride free.

Subsequent to this—perhaps a year or two later—it developed that trading in the unused parts of excursion tickets was still going on; the company was suffering considerable loss of revenue because of this; and the manager suspected the plaintiff as the party, or one of the parties, doing it.

The conductors were instructed to watch him as he passed to and fro over the road, but he was not detected. From other sources, however, information seems to have reached the manager which caused him to believe the plaintiff was guilty of the acts complained of, though the evidence fails to connect him, convincingly, therewith.

So believing, the manager, finding the plaintiff one day on the train of his company, going from Pearl River to Covington, had him called up to him and ordered him off the train.

The train had just gotten under way, being at the time some five or six hundred feet from the Pearl River station.

The manager was, at the time he gave the order for his expulsion, standing on the platform of one of the cars. Plaintiff was in that portion of the same car allotted to colored people. The conductor was sent by the manager to call him out of the car to the platform. He came and was then ordered to leave the train. No explanation why he was ordered off was given. The conductor was directed by the manager to stop the train for the purpose of enforcing the order to leave. The manager, himself, called out to the engineer—the locomotive being immediately ahead of the car on whose front platform the manager was—to stop the train, and the conductor, too, gave the signal to stop.

The train was stopped, and though plaintiff offered to pay his fare to Covington, it was declined, and he was compelled to leave the train.

He was ill and suffering at the time. So ill was he that he had been unable to efficiently perform his duties on the N. O. & N. E. R. R. that morning, and was on his way to his home in Covington for rest and treatment.

He had a severe case of bleeding hemorrhoids. There is no doubt he was suffering greatly. He contends he informed the manager and conductor of his condition, urging it in support of his plea to be permitted to pay his fare and go on to his home. As to this the testimony is conflicting.

It is established that on account. of his physical condition he requested a colored man—a friend of his—to accompany him to his home, and this friend agreeing, he (the plaintiff) bought a ticket for him from Pearl River to Covington, and this friend was on the car with plaintiff when the latter was ejected, and he (the friend) also left the train at the time plaintiff was put off.

It was in the early forenoon when this occurred, and plaintiff, in his suffering condition and unable to procure where he then was the services of a physician, was compelled to lie over at Pearl River station until five o'clock that afternoon, at which time a second train left the station for Covington. He purchased a ticket and took that train, arriving at his home that night.

The next morning he received medical attention, the testimony of the physician showing a condition of much seriousness and suffering. Later he went to a hospital in New Orleans for treatment.

A few days, or immediately following his expulsion as above from defendant's train, he was discharged from the service of the N. O. & N. E. R. R. Company.

An effort was made to show that this discharge came about through representations made to that company by the manager of defendant company; but the testimony offered for this purpose was ruled out.

The plaintiff brought this suit for damages on account of his expulsion from the train. He claims five thousand dollars as compensation for the pain and suffering he underwent and for the humiliation and disgrace of his public ejectment from the train.

He claims an equal amount as punitory damages because, as alleged, of the wanton, reckless and oppressive conduct of the officials of defendant company, and their utter disregard of the rights and feelings of persons, like himself, in the humble walks of life.

The defense was a general denial.

The case was tried by jury who returned a

110 LA.—14

verdict in favor of the plaintiff for one thousand dollars.

Defendant appeals and in this court plaintiff files answer asking an increase of the judgment to twenty-five hundred dollars.

*Ruling.*—On the statement of facts given, which sets forth our appreciation of the case as gathered from the evidence, we have concluded not to disturb the verdict of the jury.

The justification claimed for plaintiff's expulsion from the train is that he had violated the rules of the company and its rights in trafficking in excursion tickets, though that was not set up in the answer.

If he had been detected in doing this while on the train, the manager or the conductor might perhaps have been warranted in stopping the train and putting him off, even though he offered to pay his fare, though as to this no opinion is intended to be expressed.

But he was not so detected. He was doing nothing of the kind at the time of his expulsion. The train had just started. He was riding quietly in the car as any other passenger, and though he had no ticket he was there by permission of the company to travel free.

This permission, theretofore given and recognized for years, had not been withdrawn. He was not an employee of the defendant company. The manager and conductor had no right to treat him as an employee.

Even though he had no ticket, the right was his to pay his fare in cash. Because a traveler on a railway has no ticket, that, in itself, furnishes no warrant for putting him off the train. The demand upon him must be either for a ticket, or for payment of the fare in cash, and if he offers to pay, a railway company ejects him at its peril.

Here he was neither asked for a ticket, nor for payment of the fare in money.

Even if shown that he had been trafficking in the unused portions of excursion tickets, the company could not, because of that, have denied him the right to travel as a passenger on its trains, provided he paid the fare.

It could, of course, at its pleasure, have withdrawn, with or without cause shown, the permission given him to ride free, and it could have resorted to any of the means provided by the law to prevent the practice of buying and selling tickets and protect its rights from that kind of invasion.

But a man who "scalps" railroad tickets cannot, generally, be denied transportation over the lines of the railways in whose tickets he traffics. He is a part of the general public and railway companies, as common carriers, must permit all who pay the regular fare to travel on their trains.

Here the man was sick; he offered to pay his fare; it was denied him. He was angrily ordered off the train; the train was stopped in order to put him off; the manager directed the conductor to put him off.

This was the equivalent of force, even if actual force was not used, though as to that the testimony is conflicting, plaintiff claiming the conductor took him by the arm, led him to the steps of the platform and demanded of him to get off. The conductor denies that he put his hands on him, though he admits standing on the steps when Ford got off, and he followed him off, getting back on the car, himself, at the rear end as it passed on again. There is no denial by either the conductor or the manager that Ford was ordered off the car.

An examination of defendant's bills of exception taken to the admission of certain evidence over objection, and as to certain parts of the charge given by the Judge to the jury, has led to the conclusion that no reversible error was committed.

The same is true as to bills reserved to the refusal to give certain special charges asked, and as to a bill taken to a remark of plaintiff's counsel in argument.

Judgment affirmed.