Chicago, Rock Island & Pacific Railway Company *v.*
Blundell.

## Opinion delivered January 22, 1917.

1. Carriers—rules—exhibition of ticket before entering train.
—Where the rules of a carrier require a passenger to exhibit his ticket
to an employee of the carrier before he is permitted to board the train
the conductor, or person in charge of the train, will be held to have
notice of the fact that the passenger wishes to debark at the destina-
tion noted on his ticket, and knowledge of the employee to whom
passengers must exhibit their tickets before  entering upon their
journey will be imputed to the company.

2. Carriers—destination of passenger—liability of carrier—
exhibition of ticket.—A carrier will be liable in damages for car-
rying a passenger past his destination  when the passenger has com-
plied with a regulation of the carrier requiring him to exhibit his
ticket to an employee of the carrier before being permitted to board
the train.

3. Carriers—carrying passenger past station—damages.—Where
defendant carrier negligently carried plaintiff, a female passenger,
past her station, requiring her to walk back three and a half to four
and a half miles, *held*, under the facts, damages in the sum of $100
were adequate; and that damages in the sum of $25  to another ap-
pellee, a man, were proper.

Appeal from Hot Spring Circuit Court; *W. H.*
*Evans*, Judge; modified and affirmed.

### STATEMENT BY THE COURT.

Separate suits were instituted by Hartsell Blun-
dell and Rosey Blundell, his wife, against the appellant
to recover damages for the alleged negligent failure of
appellant's agent to put them off at their destination,
and the alleged negligence of appellant's agents in
carrying appellees by the destination to which they had
purchased tickets.   The appellant denied all the
allegations of the complaint.   The suits were con-
solidated for trial.

Appellee Hartsell Blundell testified substantially
as follows:  On the 16th of June, 1915, he purchased
tickets for himself and wife from appellant's agent at
Leola for passage on appellant's train from that station
to Sims.  They boarded the appellant's passenger train

at Leola, and changed cars at Haskell to go to Sims, the place of their destination. Sims was a flag station. The train stopped there when it was flagged and when it had passengers who wished to get off there. When Blundell and his wife got on the train after changing cars at Haskell they sat down on the first seat in the front of the coach. When the conductor came in he passed by them and went out at the door. When the train whistled for Sims, Blundell got up and went through the train, but did not see the conductor. When the conductor first came through the train Blundell reached up into his coat to get the tickets, but the conductor went right on by him. Appellees were put off at Butterfield. It is four or five miles from Butterfield to Sims. Blundell and his wife were on a visit to Mr. Wade's, his wife's father. They purchased their tickets to Sims, and it was about a mile and a half from Sims to Mr. Wade's. It is about five miles from Butterfield, where they were put off, back to Mr. Wade's. Blundell said that the walk did him harm. He had to carry two big suit cases. Soon after leaving Haskell the conductor came through the train taking up tickets. Blundell had his tickets in his coat pocket. The tickets were not punched between Haskell and Sims. The conductor kept going right on through. When he got to the door he turned his head towards Blundell, but did not stop. Blundell did not pay any attention to whether the conductor took up tickets from other passengers or not. He thought it was the conductor's business to do that. He knew that the conductor had overlooked him and his wife and had not taken up their tickets. Blundell had the tickets ready for him, but did not think it was his business to run the conductor down to give him the tickets. Blundell did not know whether the train would stop at Sims or not. It most always stopped there. When the train whistled to go through Sims he decided that he had better look up the conductor, and undertook to do so, but by the time he had gone through the coach the train had passed Sims. Butterfield was the next

stop. At Butterfield Blundell told the conductor that he had tickets for Sims, and showed them to him, but did not give them to him. Sometimes they have an auditor on the train to take up the tickets and the conductor has nothing to do with collecting the fares. The conductor sometimes works right around the passengers without taking up the tickets. Blundell did not know whether they had an auditor on the train that day or not. There was nobody at Sims to meet them if they had debarked there. There was a train going back to Sims from Butterfield the same evening at 8:30. Blundell and his wife did not wait for that train, because they did not have any money and the conductor did not say anything about a pass back.

Appellee, Mrs. Rosey Blundell, corroborated substantially the testimony of her husband. She stated that they were in the front of the car, with their backs towards the way the train was going, When the conductor came by she called her husband's attention to him and her husband reached up to get the tickets, but the conductor walked on. The train stopped at Franzway, where two girls got on, when the conductor came through again and she told her husband to give him the tickets, but the conductor went on by. The conductor took up the tickets of the two young ladies that got on at Franzway. There were a good many passengers on the coach and she saw the conductor take up tickets from the other passengers. When the conductor passed witness and her husband he "kinder checked up and looked around." Her husband pulled out the tickets, but the conductor did not take them. Neither she nor her husband said anything to the conductor and he did not say anything to them. The walk that night made her awful sore. She was sick in bed all the next week.

The conductor of appellant testified that he was the conductor on the train when Blundell and his wife were carried by Sims and put off at Butterfield. He had been on that run for a year, and he took up the tickets on that train. The train did not stop at Sims

unless it was flagged, or there were passengers to debark. When his train arrived at Benton four or five people got on the train at that station and he took up their fares before the train arrived at Haskell. When the train arrived at Haskell he had to register there, and he did notice Blundell and his wife get on. When the train started out from Haskell the parties that got on at Benton had scattered through the car and Blundell and his wife had taken their seats next to the front door. When he went through collecting fares he simply overlooked the couple, thinking they belonged to the party that got on at Benton. He collected the tickets out of Haskell and Franzway and then told the porter that they did not have anybody on board for Sims and so did not stop there that night. In going through the car he stopped and looked at Blundell, but mistook him for another party. If Blundell had offered him his ticket he would have taken it and put him off at Sims. When the train reached Butterfield, witness asked Blundell why he had not given him his tickets and Blundell replied, "Because you did not ask for them." Witness told Blundell that he would give him passes back to Sims and he could go back to Sims in an hour, but Blundell refused to take the passes. Witness' duties were to run the train—get orders, take up fares and run the train. When witness had a passenger for a certain station it was his duty to stop the train and let the passenger off. There was no auditor on that train. At a small station witness could check up the number of passengers that got on and off. Passengers are supposed to show their tickets when getting on at ticket stations.

The court, among others, granted the following prayer of the appellees for instruction:

"You are instructed that if you find from the evidence in this case, that the plaintiffs had tickets entitling them to passage on defendant's train from Haskell to Sims station, and that they were required by the defendant's agent or agents to produce and show their tickets at Haskell, before permitting them to get

aboard the train, this would be notice to the agents or servants of the defendant company that the plaintiffs were passengers on said train and that their destination was Sims, and it was the duty of those in charge of said train to stop it at Sims station a sufficient length of time to allow plaintiffs to alight from said train, and if the agents or servants of said train failed to do so, then they were guilty of negligence, and if you find that the plaintiffs were in any way injured by reason of the negligence of the defendant, you will assess in their favor whatever amount the evidence shows they are entitled to."

The court refused appellant's prayer for instruction No. 5, but modified the same and gave it as modified (the modification made by the court being indicated by the words italicized) as follows:

"You are instructed that if you find from the testimony that the conductor in charge of defendant's train did not know that the plaintiffs' destination was Sims, and that in passing through the coach where they were seated, he had overlooked them and by reason thereof had failed to ask them for their tickets, *and if his acts were such as to lead them as reasonably prudent people to believe that he would not call for their tickets and stop the train at Sims and allow them to alight therefrom*, and the plaintiffs had a reasonable opportunity, *after learning that the conductor had overlooked them and not taken up their tickets, and that the train might not stop at Sims*, to call his attention to the fact that he had overlooked them or had not taken up their tickets, and the plaintiffs knew the station of their destination was a flag station and that the train might not stop there unless it was flagged by some one or unless there was some one on the train who had notified the conductor by paying fare or giving up a ticket, or otherwise, that he wanted to get off there, and plaintiffs failed to call the attention of the conductor to the fact that they wanted to get off at Sims, they were guilty of such negligence as will prevent them from

recovering in this case, and your verdict will be for the defendant."

Exceptions were duly saved to the rulings of the court on the instructions. The jury returned a verdict in favor of appellee Rosey Blundell for $200.00, and in favor of Hartsell Blundell in the sum of $25.00. From judgments in favor of the appellees respectively in these sums these appeals were taken.

*Thos. S. Buzbee* and *Geo. B. Pugh,* for appellant.

1. The law of this case is laid down in 32 S. E. 873. On the authority of that case, the court erred in refusing defendant's instructions 3 and 5, and in giving for plaintiffs Nos. 1, 2 and 1½.

2. The verdicts are excessive. There is no evidence at all, of any injury, expense or loss of time. 122 Ark. 477; 67 Ark. 123; 101 Ark. 90.

*H. B. Means,* for appellee.

1. This case is in no respect like 32 S. E. 873. The question whether or not the company was to blame was fairly submitted to the jury and the verdict is final.

2. The damages are not excessive. 103 Ark. 558.

Wood, J. (after stating the facts). In *Rock Island Ark. & La. Rd. Co.* v. *Stevens,* 84 Ark. 436, we held (quoting syllabus) that "The fact that a passenger purchased a ticket from a station agent entitling her to be carried to a flag station is not notice to the conductor of a train that she desires to debark at that station."

We also held in that case that where a passenger sees that the train is crowded and that the conductor is necessarily detained elsewhere, or where the distance is so short, or there are other indications that the conductor or other person in charge of the train would not obtain notice in time to stop the train, the passenger must give him notice or else he cannot complain if he is carried beyond his destination.

In *Railway* v. *Stevens, supra,* we quoted from *Central of Ga. Ry. Co.* v. *Dorsey,* 106 Ga. 826, as fol-

lows: "We think it is the duty of the conductor of a passenger train, when the company has sold tickets to passengers, to go through the train and ascertain the station at which the passengers wish to alight; but we also think that, in a case like the present, there is a corresponding duty upon the part of a passenger, when he sees that the conductor has failed to call for and take up his ticket, and is ignorant of his presence on the train and of his destination, to notify the conductor of his presence and destination, especially when the ride is a short one, and the passenger knows that the train will not stop at his station unless the conductor has notice that there is on board a passenger for that station."

Counsel for plaintiff rely upon this doctrine of the Georgia case, which is but the rule that was approved by us in *Railway Co.* v. *Stevens, supra.*

In the case of *St. L. & S. F. Rd. Co.* v. *Dyer,* 115 Ark. 262, 266, we said: "A railroad company has the right to require all persons to purchase tickets before becoming passengers. As a means of enforcing this regulation it has the right to require the exhibition of their ticket before entering the train." See also, *St. L. S. W. Ry. Co.* v. *Branch,* 106 Ark. 269, 272; *S. L. S. W. Ry. Co.* v. *Hammett,* 98 Ark. 418; *St. L. S. W. Ry. Co.* v. *Blythe,* 94 Ark. 153.

(1) In *Rock Island, Ark. & La. Ry. Co.* v. *Stevens, supra,* we held that the purchase of a ticket from a station agent entitling a passenger to be carried to a flag station is not notice to the conductor that she had such ticket and wished to disembark at a certain station. But where railway companies require passengers before entering the train to exhibit their tickets to their servants and agents having charge of the particular train upon which passengers intend to embark before entering such train, this is notice to the conductor having charge of the running of the train that the passengers who are required to exhibit their tickets before entering the train have such tickets. Having such notice, it is the duty of the conductor, or

whatever agent the company designates for that purpose, to take up these tickets and to see that the passengers are transported according to their contract. It would be manifestly unfair to the passenger to compel him to exhibit his ticket before entering the train and then permit the company to say in the next breath that it had no notice of such ticket, and that its agent could be excused, under certain circumstances, for a failure to take up the ticket and to carry and deliver the passenger according to the contract of carriage.

(2) Knowledge of the agent to whom passengers must exhibit their tickets before entering upon their journey will be imputed to the company. Where the passenger has complied with the reasonable regulations of the company in regard to purchasing his ticket and exhibiting the same before entering the car the company will be liable in damages for failure of the carrier to transport him and to allow him to debark at his destination. The passenger having exhibited his ticket and thus notified the company that he has a contract of carriage, has done all that he is required to do to establish the relation of passenger and carrier, and it thereafter devolves upon the carrier to perform its contract according to the terms thereof, and a failure to do so is a breach of contract for which the carrier is liable in damages to the passenger thus injured.

Where the passenger is not required to exhibit his ticket at the station where he embarks upon his journey then the carrier has no notice of such ticket until same is exhibited to the conductor or auditor, as the case may be, whose duty it is to lift or check such tickets. In such cases, under certain circumstances, it can readily be seen that the company might not have any notice of the passenger's ticket and of its contractual obligations thereunder until it was too late, in the exercise of ordinary care, to carry out its contract as evidenced by the ticket. For example, one might purchase a ticket to a flag station a short distance

away, the train upon which he embarked might be crowded with passengers and it might be impossible for the officer whose duty it was to check up the tickets, in the exercise of reasonable diligence, to do so before reaching the flag station where the passenger was to debark.   In such case it can readily be seen that it would become the duty of the passenger to notify the conductor of the flag station where he wished to debark; otherwise the company, although exercising ordinary care in the premises, would have no notice, and the failure to put the passenger off at his station would be the result of his own negligence.   Such indeed were substantially the facts upon which the ruling in *Railway* v. *Stevens* and *Railway* v. *Dorsett*, *supra*, was predicated.   But such a rule, as we have already stated, can have no application to a case like the one at bar, where the servants of the carrier in charge of the train have notice, by the exhibition of a ticket before the passenger embarked upon his journey, of the fact that he was a passenger and the station to which he was to be carried.   Every requirement of the law is fully met when the passenger has complied with the reasonable regulations of the carrier designed to bring to its notice the presence of the passenger on the train, and of his destination.

It follows that there was no prejudicial error to appellant in the rulings of the court on the instructions. These rulings, in fact, were more favorable to appellant, under the law as above announced, than it was entitled to.

(3)   It is contended that the verdicts were excessive, and we are convinced that this is true as to Mrs. Blundell.   Appellee, Rosey Blundell, had to walk a distance of from 3½ to 4½ miles further than she would have had to walk if the train had stopped at Sims; and she testified that this walk made her sore, and that she was sick in bed all the next week.   According to the testimony abstracted, she does not say that her sickness was caused by the walk.   But even conceding that such was the legitimate inference to be

drawn from the testimony, the sum of $100.00 will afford ample compensation for all possible injury that she could have sustained by reason of appellant's breach of contract.

Appellees, so far as the proof shows, were not subjected to any indignities and suffered no mental anguish. The only injury they sustained was the mere physical inconvenience of having to walk a distance of five or six miles, whereas, if they had been put off at their destination they would have had only a distance of a mile and a half to walk.

While it is most difficult to determine the measure of damages in such cases, yet here there are no circumstances of aggravation attending the breach of contract and the jurors in such cases should not indulge in speculations and award imaginary damages but should assess the amount at what they believe under the evidence to be actual compensation for the injuries sustained.

Appellee Hartsell Blundell testified that the walk did him harm, as he had to carry two large suit cases. While it appears to us that a verdict of $25.00 would be quite liberal compensation for his injuries, we do not see our way clear to reduce it below that sum, and the judgment as to him will be affirmed.

In the case of the appellee, Mrs. Rosey Blundell, the judgment will be modified and reduced to the sum of $100.00, and as thus modified affirmed.